No. 23-15599

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS,
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, FRIENDS OF
THE RIVER, SAN FRANCISCO CRAB BOAT OWNERS ASSOCIATION,
INC., INSTITUTE FOR FISHERIES RESOURCES,
and FELIX SMITH,

Plaintiffs-Appellants,

v.

ADAM NICKELS, Acting Regional Director of the U.S. Bureau of
Reclamation, U.S. BUREAU OF RECLAMATION,

Defendants-Appellees,

SAN LUIS & DELTA-MENDOTA WATER AUTHORITY and
GRASSLANDS WATER DISTRICT,

Intervenors-Defendants-Appellees.

---

ON APPEAL FROM THE EASTERN DISTRICT OF CALIFORNIA
NO. 2:11-cv-02980-DAD-CKD

---

APPELLANTS' PETITION FOR REHEARING EN BANC

---

STEPHAN C. VOLKER (CSB #63093)
STEPHANIE L. CLARKE (CSB #257961)
JAMEY M.B. VOLKER (CSB #273544)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703
Tel: (510) 496-0600
Fax: (510) 845-1255
email: svolker @volkerlaw.com
         sclarke@volkerlaw.com
         jvolker@volkerlaw.com

## TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.    INTRODUCTION AND FRAP 35 STATEMENT. . . . . . . . . . . . . . . . . . 1

    A.    Ninth Circuit Rulings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    Supreme Court Rulings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    C.    Other Authoritative Circuit Rulings. . . . . . . . . . . . . . . . . . . . . . 4

    D.    Clean Water Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    E.    EPA Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.    BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    Legal Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    C.    Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

III.    THE OPINION CONFLICTS WITH DECISIONS OF THIS
COURT, THE SUPREME COURT AND OTHER COURTS OF
APPEAL . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.    The Opinion Invents an Extra-Statutory Exemption
From NPDES Permitting of the Point Source Discharge
of Pollutants Originating From "Non-Point Sources" on
Unfarmed and Non-Irrigated Lands. . . . . . . . . . . . . . . . . . . . . 10

    B.    The Opinion Departs From the Circuit Rule that Exemptions
to the CWA's Permit Requirement Are Construed Narrowly . .14

    C.    The Opinion Departs From the Circuit Rule that Defendants
Have the Burden of Proof to Establish the Exemption . . . . . . .14

    D.    The Opinion Departs From the Circuit Rule that Discharges
Must be "Entirely" Return Flows from Irrigated Agriculture . .15

    E.    The Opinion Overlooks Congress' Rejection of an Amendment
to Exempt the San Luis Drain From NPDES Permitting . . . . . . .15

**IV.**    **THE OPINION CONFLICTS WITH THE GOVERNING EPA REGULATION THAT "POINT SOURCE" DISCHARGE INCLUDES THE COLLECTION AND DISCHARGE OF NON-POINT SOURCES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

**V.**    **THE OPINION OVERTURNS SETTLED CWA LAW BY HOLDING THE DISCHARGE OF SELENIFEROUS DUST EXCUSES UNLAWFUL DISCHARGES OF OTHER POLLUTANTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16

**VI.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**CERTIFICATE OF COMPLIANCE (Form 11)** . . . . . . . . . . . . . . . . . . . . . . . 18

**APPENDIX: OPINION FOR PUBLICATION**

**CERTIFICATE OF SERVICE**

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Committee to Save the Mokelumne River v. East Bay Municipal Utility Dist.*
13 F.3d 305 (9th Cir. 1993)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*County of Maui, Hawaii v. Hawaii Wildlife Fund*
590 U.S. 165 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16

*Fishermen Against the Destruction of the Environment, Inc. v. Closter Farms, Inc.*
300 F.3d 1294 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

*Na Kia'i Kai v. Nakatani*
401 F.Supp.3d 1097 (D. Hawaii 2019). . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Northern California River Watch v. City of Healdsburg*
496 F.3d 993 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6, 14

*Northwest Environmental Defense Center v. Brown*
640 F.3d 1063 (9th Cir. 2011); *rvsd. and rem. on other gds.*
*sub nom. Decker v. Northwest Environmental Defense Center*,
568 U.S. 597 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Pacific Coast Federation of Fishermen's Associations v. Glaser*
945 F.3d 1076 (9th Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Rybachek v. EPA*,
904 F.2d 1276 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*S.D. Warren Co. v. Maine Board of Environmental Protection*
547 U.S. 370 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

*Sierra Club v. El Paso Gold Mines, Inc.*
421 F.3d 1133 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Sierra Club v. Union Oil Co. of California*
813 F.2d 1480 (9th Cir. 1987) (*vac. and rem. on other gds.*
*sub nom. Union Oil Co. of California v. Sierra Club*,
486 U.S. 931 (1988); *reinstated,* 853 F.2d 667 (9th Cir. 1988))). . . . . 1, 5, 17

*South Florida Water Management Dist. v. Miccosukee Tribe of Indians*
541 U.S. 95 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Udall v. Tallman*
  380 U.S. 1 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*U.S. v. Akers*
  785 F.2d 814 (9th Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Weinberger v. Romero-Barcelo*
  456 U.S. 305 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## Statutes

United States Code, Title 33
  §§ 1251 *et seq.* ("Clean Water Act"). . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
  § 1251(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 17
  § 1311(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
  § 1342. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
  § 1342(l)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 6, 11
  § 1362(12)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
  § 1362(14). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 12

## Code of Federal Regulations

Title 40
  Part 122. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5
  § 122.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*
  § 122.3(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## Rules

Federal Rules of Appellate Procedure ("FRAP")
  Rule 35. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## I.   INTRODUCTION AND FRAP 35 STATEMENT

Appellants California Sportfishing Protection Alliance, Friends of the River, San Francisco Crab Boat Owners Association, Inc. and Felix Smith ("Plaintiffs") petition for rehearing *en banc* of the panel decision (Appendix A; "Opinion").  It holds contrary to the plain language, settled caselaw and governing regulations of the Clean Water Act's ("CWA's," 33 U.S.C. §1251 et seq.) National Pollutant Discharge Elimination System ("NPDES") permitting program that the San Luis Drain's massive point source discharge of pollutants collected from non-point sources (such as surface flows) on thousands of acres of *unfarmed* lands are exempted from permitting by the CWA's "return flow from irrigated agriculture" exemption (33 U.S.C. §1342(*l*)(1)).  It allows non-agricultural dischargers to evade permitting under the CWA by commingling their wastewater with farm discharges, and all dischargers to evade permitting of their point source discharges if *any* of their wastes originate from non-point sources.  *En banc* consideration is necessary to secure uniformity of the Court's decisions for four reasons.

First, the Opinion's holding that the Drain is not a "discharge" conflicts with four decades of CWA jurisprudence including the following decisions of this Court and the Supreme Court:

### A.   Ninth Circuit Rulings

(1)  *U.S. v. Akers* ("*Akers*"), 785 F.2d 814, 819 (9th Cir. 1986).  *Akers* held Congress intended that CWA exemptions be construed "narrowly."

(2)  *Sierra Club v. Union Oil Co. of California* ("*Union Oil*"), 813 F.2d 1480, 1490-1491 (9th Cir. 1987); *remanded sub nom*. *Union Oil Co. of California v. Sierra Club*, 486 U.S. 931 (1988); *reinstated*, 853 F.2d 667 (9th Cir. 1988)).

*Union Oil* held the U.S. Environmental Protection Agency's ("EPA's") CWA regulations (40 C.F.R. Part 122) govern NPDES permitting. Section 122.2 states: "[t]his definition [of 'discharge of pollutants' triggering NPDES permitting] includes additions of pollutants into waters of the United States from: *surface runoff which is collected or channeled* by man . . . ." (Emphasis added.)

(3) *Committee to Save the Mokelumne River v. East Bay Municipal Utility Dist.* ("*Mokelumne*") 13 F.3d 305, 308 (9th Cir. 1993). Citing 40 C.F.R. §122.2 with approval, *Mokelumne* held a point source discharge of contaminated surface runoff – exactly the circumstance here – requires an NPDES permit.

(4) *Northern California River Watch v. City of Healdsburg* ("*River Watch*") 496 F.3d 993, 1001 (9th Cir. 2007). *River Watch* held "[c]laims of exemption[] from . . . the CWA's broad pollution prevention mandate must be narrowly construed." The Opinion flips this rule on its head by construing the irrigated agriculture exemption so broadly the exception swallows the rule: it exempts the Drain's point source discharges of pollutants from lands that are neither farmed nor irrigated.

(5) *Pacific Coast Federation of Fishermen's Associations v. Glaser* ("*Glaser*"), 945 F.3d 1076, 1085 (9th Cir. 2019). *Glaser* held "Defendants had the burden of establishing that the Project's discharges were 'composed entirely of return flows from irrigated agriculture," the term "'[e]ntirely' is defined as 'wholly, completely, fully,'" and "Congress intended for discharges that include return flows from activities *unrelated to crop production to be excluded from the statutory exception, thus requiring an NPDES permit for such discharges*." (*Id.*, emphasis added.) The Opinion, to the contrary, exempts such discharges.

- 2 -

### B.    Supreme Court Rulings

(6)  *South Florida Water Management Dist. v. Miccosukee Tribe of Indians* ("*Miccosukee*"), 541 U.S. 95, 105 (2004).  *Miccosukee* held "a point source need not be the original source of the pollutant, it need only convey the pollutant to . . . 'waters of the United States.'" The Opinion contravenes this holding by mistakenly exempting the Drain's discharges originating from unfarmed lands because their "original source" is not a "point source."  This distinction makes no sense.  It is a physical impossibility since the CWA defines "point source" as a discharge *to waters of the United States*.  (*Id*.)  Only the Drain discharges to waters of the U.S., not the "originating" sources of its pollutants.

(7)  *S.D. Warren Co. v. Maine Board of Environmental Protection* ("*Warren*"), 547 U.S. 370, 375-376 (2006).  Upholding CWA §401 certification for dam releases, *Warren* construed the term "discharge" broadly "'in accordance with its ordinary meaning.'"  Under *Warren*, the Drain is a plainly a "discharge."

(8)  *County of Maui, Hawaii v. Hawaii Wildlife Fund* ("*Maui*") 590 U.S. 165, 177-178 (2020).  *Maui* required an NPDES permit for wastewater discharges to the ocean via an underground channel.  It construed "point source" broadly per EPA's "longstanding regulatory practice" to include discharges that were "the functional equivalent of a direct discharge" to achieve the CWA's purposes.  Likewise here, EPA's "longstanding regulatory practice" per 40 C.F.R. §122.2 states "point sources" "include[] additions of pollutants into waters of the United States from: surface runoff which is collected or channeled by man" – exactly what the Drain does here.  The Opinion ignores this controlling regulation.

- 3 -

### C. Other Authoritative Circuit Rulings

Second, the Opinion poses a question of exceptional importance because it conflicts with these authoritative decisions of other Courts of Appeals:

(9) *Fishermen Against the Destruction of the Environment, Inc. v. Closter Farms, Inc.* ("*Closter Farms*"), 300 F.3d 1294, 1298 (11th Cir. 2002). The Eleventh Circuit stated "[a]ny pollutants that originated in the non-agricultural properties adjacent to [the defendant's agricultural land] obviously do not fall within the agricultural exemptions." So too here, the pollutants the Drain collects from adjacent unfarmed lands "obviously do not fall within the agricultural exemption." The Opinion holds the opposite.

(10) *Sierra Club v. El Paso Gold Mines, Inc.* ("*El Paso*"), 421 F.3d 1133, 1142 (10th Cir. 2005). The Tenth Circuit held "the collecting and channeling of surface runoff" is subject to NPDES permitting. (*Id.*, paraphrasing *Mokelumne*, 13 F.3d at 308.) The Opinion holds the opposite.

### D. Clean Water Act

Third, the Opinion poses a question of exceptional importance because it conflicts with the CWA's plain language that only "return flows" that are "entirely" from "irrigated agriculture" are exempt from NPDES permitting. Contrary to this restriction, the Opinion exempts (1) discharges from *un*farmed lands that are commingled with farmland discharges, and (2) all point source discharges of pollutants originating from "non-point sources." (33 U.S.C. §§ 1251(a), 1342(*l*)(1).)

- 4 -

### E.    EPA Regulations

Fourth, the Opinion poses a question of exceptional importance because it conflicts with EPA's governing regulation implementing the NPDES, 40 C.F.R. §122.2.  This regulation directs contrary to the Opinion that the CWA's "definition [of 'discharge of pollutants' triggering NPDES permitting] includes additions of pollutants into waters of the United States from: *surface runoff which is collected or channeled by man*" – exactly the situation here.  *Union Oil* held EPA's regulations in 40 C.F.R. Part 122 govern the NPDES permit program.  (813 F.2d at 1490-1491.)  *Mokelumne* applied section 122.2 to require NPDES permitting for the collection and discharge of contaminated surface runoff to a navigable water – exactly the circumstance here.  (13 F.3d at 308.)

## II.    BACKGROUND

### A.    LEGAL BACKGROUND

The CWA aims "'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  (*Warren*, 547 U.S. at 385, quoting 33 U.S.C. §1251(a).)  "This purpose is to be achieved by . . . compliance with the permit requirements."  (*Weinberger v. Romero-Barcelo*, 456 U.S. 305, 315 (1982).)  The CWA's strict liability scheme "categorically prohibits any discharge of a pollutant from a point source without a permit."  (*Mokelumne*, 13 F.3d at 309.)  "To establish a violation of the CWA, 'a plaintiff must prove that defendants (1) discharged, i.e., added (2) a pollutant (3) to navigable waters (4) from (5) a point source.'"  (*Glaser*, 945 F.3d at 1083.)

The CWA exempts discharges "'composed *entirely* of return flows from irrigated agriculture'" from NPDES permitting.  (33 U.S.C. §§1342, 1362(14); 40

C.F.R. §122.3(f)).) (*Glaser*, 945 F.3d at 1083, quoting 33 U.S.C. § 1342(*l*)(1) (emphasis added).) Congress intended "entirely" be given its common meaning of "wholly, completely, fully" (*id*. at 1085) and that "[c]laims of exemption[] from . . . . the CWA's broad pollution prevention mandate . . . be narrowly construed to achieve the purposes of the CWA" (*River Watch,* 496 F.3d at 1001).

Therefore, as the District Court initially recognized before its rulings strayed, "the 'return flows' exemption 'covers discharges from irrigated agriculture that *do not contain additional discharges* unrelated to crop production.'" (1FER101 (emphasis added).) Consequently, the District Court initially (and correctly) reasoned, "[t]he exemption does not cover . . . commingled discharges" – discharges composed of *both* exempt agricultural return flows and "additional discharges." (1FER100.)

Because the Project's Drain discharges wastewater from irrigated agriculture commingled with non-exempt discharges originating from unfarmed lands, its discharges are not "composed entirely of return flows from irrigated agriculture." Therefore they are not exempt from NPDES permitting required by 33 U.S.C. §1311(a).

Yet the Opinion holds all the Drain's discharges – including from unfarmed lands – are exempt from NPDES permitting. (Opinion 18, 27, 30.) This interpretation:

(1) ignores the fact Defendants acknowledged the need for and obtained an NPDES permit in 1996 – since expired – to discharge the same commingled wastewater they now claim is exempt (3ER512-513);

(2) stretches the definition of the "related to crop production" exemption far

beyond its reasonable scope to include pollutants from unfarmed lands;

(3) conflicts with the settled rule that "[c]laims of exemption . . . of the CWA's broad pollution prevention mandate must be narrowly construed to achieve the purposes of the CWA" (*Glaser,* 945 F.3d at 1085); and

(4) disregards *Glaser's* holding that the term "entirely" must be given its "'ordinary, contemporaneous, common meaning'" of "'wholly, completely, fully'" (945 F.3d at 1085) and contravenes this express statutory restriction.

### B.    FACTUAL BACKGROUND

Defendants U.S. Bureau of Reclamation ("Reclamation") and San Luis and Delta-Mendota Water Authority ("SLDMWA") own and operate the Grasslands Bypass Project ("Project").  (2ER162; 1FER65, 109.)  The Project is a "commingled" disposal facility draining wastewater from farmland irrigated by the Central Valley Project ("CVP") *and* from thousands of acres of *unfarmed* lands. Of the 97,400 acres within the Grasslands Drainage Area ("GDA"), 64,300 acres do not contribute *agricultural* drainage to the Project via its Grasslands Bypass Channel ("Bypass") that feeds into the Drain.  (3ER519-520.)  The unfarmed lands are used for other human activities including residential, industrial (e.g., sewage ponds), managed wildlife refuges and roads.  (*Id.*; 2FER226-228, 279-309, 312 (map), 314 (chart); 3ER497-499; 7FER1604-1605.)

The Project's principal feature is its 28-mile uncovered Drain "designed to collect and convey contaminated groundwater from lands adjacent to and upstream of the Drain to Mud Slough."  (*Glaser*, 945 F.3d at 1081; 2FER333-360.)  It is excavated 10 feet deep with "weep valves" intended to drain surrounding groundwater whose depth averages 6.8 feet.  (2FER333, 340; 3ER497-498, 603;

7FER1601-1604.)  The Drain's concrete lining has many cracked, buckled and collapsed sections.  (7FER 692, 719-722 ("cracks" and "fractures" increase inflow from adjacent contaminated groundwater), 1604; 10FER2179-2187, 2194-2196, 2208-2209 (expert's photographs).)

Like an open sewer, the Drain picks up its load of polluted water from the Bypass and carries this waste to Mud Slough.  (3ER494.)  Unlike a sewer, the Drain, with its known cracks, collapsed walls and weep/seep valves, also collects polluted drainage from vast stretches of non-irrigated land – unrelated to crop production – located on either side, causing its flow to increase up to 31% between its Bypass inlet and its Mud Slough outlet  (2ER227-228, 288-309, 312 (map), 314 (table); 3ER497-499 603, 692; 4FER719; 5FER1032-1066; 7FER1598-1609.)

The vast majority of these adjacent lands whose polluted groundwater drains into the Drain are unfarmed.  (*Id*.)  Retired Regional Water Board engineer (and Plaintiffs' expert) Steven Bond prepared a detailed map and table identifying the land uses on all 38 adjacent parcels showing 87% of the Drain's length (24.0 of 27.6 total miles) was adjoined on one or both sides by unfarmed lands (including sewage treatment ponds) whose polluted groundwater seeped into the Drain.  (*Id*.).)  Defendants' expert Ricardo Ortega did not dispute the land use on 32 of the 38 adjacent segments Mr. Bond identified.  (2ER279-281, 286 (only 6 segments disputed), 298; 307-309, 312 (map), 314 (chart); 3ER497-499.)

The Estuary Institute's monthly reports commissioned by Defendants show drainage from the mostly unfarmed lands along the Drain's 28-mile length increases wastewater as much as 52%, salts 38% and selenium 4%.  (2FER245, 3FER419, 692-694; 4FER723-725; 5FER1032-1066; 11FER2391.)  Defendants' modeling

shows this drainage adds 5,801 acre-feet of wastewater (equal to one square mile 9 feet deep), 181 pounds of selenium, and 20,840 tons of salts annually – all discharged to Mud Slough. (2FER396-399 (Table C-23 (flow), Table C-24 (selenium), and Table C-25 (salt).)

The Drain's discharges contain "high concentrations of selenium" and other pollutants including boron and salts. (3FER465; 10FER2326-2327; 11FER2389-2391 (quote).) In 2011, the year Plaintiffs filed suit, the Drain discharged 1,967 pounds of selenium. (10FER2316-2318, 2333-2337). The average selenium concentration was 29.8 micrograms per liter ("ug/L"), nearly 6 times higher than the maximum 4-hour average allowed under the Regional Board's Basin Plan, 5.0 ug/L. (5FER1076 (Table III-1), 1079 (Table 2a); 10FER2318.) In wet years, the Drain discharged 21,410 acre feet of wastewater, 4,480 pounds of selenium, and 113,691 tons of salts into Mud Slough. (2FER400 (Table C-26).)

Selenium at toxic levels kills and deforms fish and wildlife, and caused the massive waterfowl kill at the former Kesterson Reservoir near Mud Slough in 1983 that federal biologist (and Plaintiff) Felix Smith discovered. (10FER2318; 11FER2349.)

Defendants could have remedied the inflow of contaminated groundwater from adjacent unfarmed lands, but chose not to. They considered constructing various new drains or pipes (2FER334-337) or a treatment plant (2FER389-391), but never built any. (*Id*.) Because they refused to cover the Drain, "pipe" its wastewater, or treat its discharge, "the Drain discharges substantial quantities of selenium and other pollutants into Mud Slough, the San Joaquin River, and the Bay-Delta Estuary" (*Glaser*, 945 F.3d at 1081), much of it from unfarmed lands.

Because the contaminated groundwater from unfarmed lands (including sewage ponds) draining into the Drain is not a return flow from irrigated agriculture, the Project's discharges require an NPDES permit.

## C. PROCEDURAL BACKGROUND

*Glaser* recounts this proceeding's history from 2011 to 2019, when it reversed the District Court's first dismissal, holding it erred by (1) requiring Plaintiffs to prove the Drain's discharges were not exempt, instead of requiring Defendants to prove they were, (2) interpreting the CWA's exemption of "discharges composed *entirely* of return flows from irrigated agriculture" to exempt commingled discharges where just a "*majority*" of the discharge related to crop production, and (3) dismissing Plaintiffs' claims alleging the Drain's discharge of accumulated seleniferous sediment, seepage of contaminated groundwater, drainage to lower the groundwater level beneath the high-tension Vega solar use, and (4) runoff from residential and other uses on unfarmed lands. (*Glaser*, 945 F.3d at 1080-1087.)

On remand, the District Court again dismissed this case, and Plaintiffs appealed. On September 5, 2025 this Court affirmed. Its deeply flawed Opinion (Appendix A) warrants rehearing.

## III. THE OPINION CONFLICTS WITH DECISIONS OF THIS COURT, THE SUPREME COURT AND OTHER COURTS OF APPEAL

### A. The Opinion Invents an Extra-Statutory Exemption From NPDES Permitting of the Point Source Discharge of Pollutants Originating From "Non-Point Sources" on Unfarmed and Non-Irrigated Lands

The Opinion holds that pollutants from unfarmed lands discharged by a point source (the Drain) are exempted by the CWA's "return flow from irrigated

agriculture" exemption if they originate from a "non-point source." This holding invents an extra-statutory exemption, contrary to the CWA's plain language, controlling regulations and caselaw.

Consistent with *Glaser*, the District Court correctly held "plaintiffs have shown that pollutants (selenium, salt, boron, among others) are being added to a navigable water (Mud Slough) *from a point source* (the Project, and *specifically, the Drain*)." (1ER15 (emphasis added).) Defendants thus had the burden of proving an exemption from NPDES permitting by showing the Drain's "discharges [are] composed entirely of return flows from irrigated agriculture." (*Glaser*, 945 F.3d at 1083, citing 33 U.S.C. §1342(*l*)(1).)

The Opinion, however, departed from the exemption's plain language and *invented a second, extra-statutory exemption* excluding from NPDES permitting pollutants originating from "non-point sources" regardless of whether they were from agricultural activities. It affirmed the District Court's erroneous exemption of:

> ""the alleged sources of pollution [because they] are, on this evidence of record, *non-point sources* or stem from activities related to crop production. Therefore, they are all covered under the § 1342(*l*)(1) exception."

(1ER31 (emphasis added); Opinion 18, 27, 30.)

This is plain error because the CWA nowhere exempts the point source discharge of pollutants collected from non-point sources on unfarmed lands. Section 1342(*l*)(1) only exempts discharges "composed entirely of return flows from irrigated agriculture." (*Id*.) The governing EPA regulation specifically rejects the erroneous interpretation fashioned by the District Court and affirmed by the Opinion. It states to the contrary that

> "This definition [of "Discharge of a pollutant"] *includes additions of*

- 11 -

> *pollutants* into waters of the United States *from: surface runoff which is collected or channeled by man . . . .*"

(40 C.F.R. § 122.2 (emphasis added); quoted in *Mokelumne*, 13 F.3d at 308).)
Citing this regulation, *Mokelumne* held an NPDES permit was required when *non-point source* pollutants were collected and discharged to navigable waters. (13 F.3d at 308-309.)

Surface runoff is obviously a non-point source, but if it is collected and discharged through a point source, it requires an NPDES permit unless the point source discharge is "composed entirely of return flows from irrigated agriculture." (*Id.*; *Glaser*, 945 F.3d at 1083.) All the pollutants here were discharged through Defendants' point source – the Drain – into Mud Slough, a navigable water. (*Id.* at 1081-1082.) But as shown, much of this discharge was from unfarmed lands.

No case has ever held, nor does the irrigated agriculture exemption provide, that an NPDES permit is only required where a pollutant is *not only discharged* through a point source into waters of the United States, but *in addition*, also *originated* from a *separate, upstream point source*. The CWA and its regulations refute any such a limitation on the NPDES.

First, the CWA broadly defines "point source" as a "confined and discrete conveyance . . . *from which pollutants are or may be discharged*." (33 U.S.C. §1362(14) (emphasis added); *Glaser*, 945 F.3d at 1082, fn.1.)

Second, the CWA broadly defines "[t]he term 'discharge of a pollutant' . . . [as] (A) any addition of any pollutant *to navigable waters* from any point source." (33 U.S.C. §§1362(12)(A).) Therefore "point source" is the "point" where pollutants are discharged to navigable waters.

- 12 -

Third, the governing regulations likewise define "discharge" as the "addition of a pollutant . . . *to 'waters of the United States.*'" (40 C.F.R. § 122.2 (emphasis added).)

Fourth, these regulations specifically reject the Opinion's erroneous interpretation that excludes from the NPDES pollutants collected from non-point sources, stating:

> "This definition [of "Discharge of a pollutant"] *includes additions of pollutants* into waters of the United States *from: surface runoff which is collected or channeled by man . . . .*"

(*Id.* (emphasis added); quoted in *Mokelumne*, 13 F.3d at 308).) Surface runoff is obviously a non-point source, but if it is collected and discharged through a point source, it requires an NPDES permit. (*Id.*)

Fifth, because as shown, a "point source" is defined as a discharge to waters of the United States, it is impossible to have two separate point sources *in sequence* as the Opinion erroneously assumes, since after the first discharge occurs, the pollutants would be dispersed to navigable waters, and thus placed beyond the discharger's control (and treatment).

Where as here, a discharger commingles wastewater exempt from NPDES permitting with wastewater that is not exempt, the resulting commingled waste stream is subject to NPDES permitting. Otherwise, a discharger could evade the NPDES by simply adding an exempted farm pollutant to its otherwise non-exempt wastestream. Accordingly, where a defendant allegedly discharged drainage from non-agricultural lands together with exempt drainage from agricultural uses, the Eleventh Circuit stated that "[*a*]*ny* pollutants that *originated in the non-agricultural properties* adjacent to [the defendant's land] *obviously do not fall within the*

- 13 -

*agricultural exemptions*." (*Closter Farms*, 300 F.3d at 1298 (emphasis added).) Unlike here, in *Closter Farms* an NPDES permit was not required because the evidence "established that discharges from [the unfarmed adjacent properties] are either the subject of existing NPDES permits or are exempted from NPDES permitting." (*Id.*) Here, they are not.

### B. The Opinion Departs From the Circuit Rule that Exemptions to the CWA's Permit Requirement Are Construed Narrowly

The Court has long held that "[c]laims of exemption . . . , from the . . . permitting requirements[] of the CWA's broad pollution prevention mandate must be narrowly construed to achieve the purposes of the CWA." (*River Watch*, 496 F.3d at 1001.) The Opinion contravenes this rule by expanding the "return flows from irrigated agriculture" exemption far beyond its actual language to exempt discharges originating on unfarmed lands. (Opinion 18, 27, 30.)

### C. The Opinion Departs From the Circuit Rule that Defendants Have the Burden of Proof to Establish the Exemption

*Glaser* held that "[a]fter a plaintiff establishes [the four] elements [of NPDES permit liability], . . . the defendant carries the burden to demonstrate the applicability of a statutory exception to the CWA." (945 F.3d at 1083.) Here, the District Court held, and it is undisputed on appeal, that "plaintiffs have shown that pollutants (selenium, salt, boron, among others) are being added to a navigable water (Mud Slough) *from a point source* (the Project, and *specifically, the Drain*)." (1ER15 (emphasis added).) Thus, Defendants had to prove the Drain's discharges were exempt. But the Opinion allows them to evade this burden by exempting their commingled discharges collected from lands neither farmed nor irrigated.

- 14 -

### D. The Opinion Departs From the Circuit Rule that Discharges Must be "Entirely" Return Flows from Irrigated Agriculture

*Glaser* held the term "'[e]ntirely' is defined as 'wholly, completely, fully,'" and therefore "Congress intended for discharges that include return flows from *activities unrelated to crop production to be excluded* from the statutory exception, thus requiring an NPDES permit for such discharges." (945 F.2d at 1085 (emphasis added).) But the Opinion exempts discharges from lands that are neither farmed nor irrigated. (Opinion 18, 27, 30.)

### E. The Opinion Overlooks Congress' Rejection of an Amendment to Exempt the San Luis Drain From NPDES Permitting

The Opinion holds the Drain's discharge of pollutants is exempt from NPDES permitting because that is what Congress intended. (*Id*. 9.) That conclusion cannot be squared with the fact – noted by this Court in *Northwest Environmental Defense Center v. Brown* – that Congressman Roncalio's attempt to expand the CWA's "return flows from irrigated agriculture" exemption to include the Drain was "rejected on the House floor." (640 F.3d 1063, 1072 (9th Cir. 2011); *rvsd. and rem. on other gds. sub nom. Decker v. Northwest Environmental Defense Center*, 568 U.S. 597, 602 (2013).)

## IV. THE OPINION CONFLICTS WITH THE GOVERNING EPA REGULATION THAT "POINT SOURCE" DISCHARGE INCLUDES THE COLLECTION AND DISCHARGE OF NON-POINT SOURCES

The Opinion holds that the Drain's point source discharge of pollutants collected from unfarmed lands is exempt from NPDES permitting because those pollutants originate from non-point sources. (*Id*. at 18, 27, 30.) This holding conflicts with EPA's governing regulation, 40 C.F.R. §122.2, which as explained, specifically rejects the Opinion's exemption and states to the contrary:

- 15 -

"This definition [of 'Discharge of a pollutant'] *includes additions of pollutants* into waters of the United States *from: surface runoff which is collected or channeled by man . . . .*"

(*Id.* (emphasis added); quoted in *Mokelumne*, 13 F.3d at 308).)  EPA's authoritative regulation is entitled to "great deference."  (*Udall v. Tallman*, 380 U.S. 1, 16 (1965); *Maui*, 590 U.S. at 177-178.)

## V.  THE OPINION OVERTURNS SETTLED CWA LAW BY HOLDING THE DISCHARGE OF SELENIFEROUS DUST EXCUSES UNLAWFUL DISCHARGES OF OTHER POLLUTANTS

Plaintiffs have never advanced the claim – incorrectly attributed to them by the Opinion – that an NPDES permit is required because the Project discharges "windblown dust and algae."  (Opinion 5.)  Plaintiffs have consistently alleged the Drain collects and discharges pollutants from four human activities unrelated to crop production: (1) drainage of contaminated groundwater from unfarmed lands along the Drain (2ER288-314, 3ER497-499, 7FER1599-1604), (2) resuspension (*Rybachek v. EPA*, 904 F.2d 1276 (9th Cir. 1990)) by the Drain's mismanaged flows (3ER500-501, 7FER1598-1599, 1606; 10FER2195-2197, 2208-2213 (expert photographs)) of  274,000 cubic yards (27,000 dump truck loads) of toxic (3ER499) seleniferous sediment stored up to 7.8 feet thick (3ER501) in the Drain, (3) tile drainage of seleniferous groundwater beneath the Vega solar facility to avoid flooding its electrical facilities (6FER515, 1316), and (4) drainage of seleniferous wastewater from lands neither farmed nor irrigated (2ER288-314, 3ER497-499, 7FER1599-1604).  (*Glaser*, 945 F.3d at 1086; 2ER79-83, 94-102, 172-180, 232-240.)

The hearing transcript refutes the Opinion's claim that Plaintiffs' counsel stated that "wind-blown dust" contamination of Defendants' discharge was

- 16 -

"inevitable." Defendants declined to build alternative drain/pipe or treatment options. (2FER334-337, 389-391.) Defendants' discharge of minute quantities of dust does not excuse their massive discharges of pollutants from unfarmed lands. The Opinion's exemption of thousands of acre-feet of pollutants because of *de minimis* dust particles is analogous to exculpating a bank robber because his $10,000 haul is offset by $1 not stolen. *Union Oil* held such "aggregative" evasion of the NPDES foreign to our jurisprudence. (813 F.2d at 1491.)

## VI. CONCLUSION

The Opinion conflicts sharply with the CWA, its regulations and caselaw. Rehearing will assure fidelity to Congress' command "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." (33 U.S.C. §1251(a). "[C]ompliance with NPDES permitting requirements" will help protect and restore the San Joaquin River's imperiled water quality, fish and wildlife. (*Na Kia'i Kai v. Nakatani*, 401 F.Supp.3d 1097, 1110 (D. Hawaii 2019).)


Dated: October 20, 2025

Respectfully submitted,

*/s/ Stephan C. Volker*

STEPHAN C. VOLKER
Attorney for Plaintiffs, Appellants and Petitioners
California Sportfishing Protection Alliance, et al.

- 17 -

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 11. Certificate of Compliance for Petitions for Rehearing/Responses

*Instructions for this form:* *https://www.ca9.uscourts.gov/forms/form11instructions.pdf*

**9th Cir. Case Number(s)** 23-15599

I am the attorney or self-represented party.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel

rehearing/petition for rehearing en banc/response to petition is *(select one)*:

◉ Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and **contains the following number of words:** 4,198 .
*(Petitions and responses must not exceed 4,200 words)*

**OR**

◯ In compliance with Fed. R. App. P. 32(a)(4)-(6) and does not exceed 15 pages.

**Signature** s/ Stephan C. Volker **Date** October 20, 2025
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 11** *Rev. 12/01/24*

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

PACIFIC COAST FEDERATION OF
FISHERMEN'S ASSOCIATIONS,
INC.; CALIFORNIA
SPORTFISHING PROTECTION
ALLIANCE; FRIENDS OF THE
RIVER; SAN FRANCISCO CRAB
BOAT OWNERS ASSOCIATION,
INC.; THE INSTITUTE FOR
FISHERIES RESOURCES; FELIX
SMITH,

      *Plaintiffs-Appellants*,

  v.

ADAM NICKELS[*], Acting Regional
Director of the U.S. Bureau of
Reclamation; UNITED STATES
BUREAU OF RECLAMATION; SAN
LUIS & DELTA MENDOTA
WATER AUTHORITY,

      *Defendants-Appellees*,

No. 23-15599

D.C. No.
2:11-cv-02980-
DAD-CKD

OPINION

---

[*] Under Federal Rule of Appellate Procedure 43(c)(2), Acting Regional
Director Adam Nickels is substituted for Ernest Conant as his successor.

and

GRASSLAND WATER DISTRICT,

      *Intervenor-Defendant-*
      *Appellee.*

Appeal from the United States District Court
for the Eastern District of California
Dale A. Drozd, District Judge, Presiding

Argued and Submitted October 21, 2024
San Francisco, California

Filed September 5, 2025

Before: Richard R. Clifton, Jennifer Sung, and Gabriel P.
Sanchez, Circuit Judges.

Opinion by Judge Sanchez

## SUMMARY[**]

## Clean Water Act

The panel affirmed the district court's partial grant of
summary judgment in favor of the U.S. Bureau of
Reclamation, its Acting Regional Director, the San Luis &

---

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

Delta-Mendota Water Authority, and the Grassland Water District (collectively "Defendants"), and the district court's conclusion that Defendants met their burden of establishing that the irrigation flow exemption under 33 U.S.C. § 1342(l)(1) of the Clean Water Act ("CWA") applied to the Grassland Bypass Project (the "Project") in California's Central Valley, which comprises an expansive drainage system that takes in water used for irrigation.

The CWA generally prohibits the discharge of pollutants into navigable waters of the United States without a permit under the National Pollutant Discharge Elimination System ("NPDES") program. Congress carved out an exemption to the permit requirement for "discharges composed entirely of return flows from irrigated agriculture" and entrusted the regulation of such discharges to the States. Under this exemption, the Project has operated without an NPDES permit since 1997.

Plaintiffs sought to undo the exempted status on the ground that the Project's discharge contained pollutants that were not related to irrigated agriculture. The panel held that plaintiffs' theory did not follow from the statutory text and was inconsistent with the purpose and structure of the CWA, and as a practical matter would render the irrigated agriculture exemption a dead letter.

The panel agreed with the district court that plaintiffs failed to raise a genuine dispute of material fact as to whether the irrigated agriculture return flow exemption applied to the Project. The panel concluded that the exemption applied because the alleged pollutants were either added to the Project via nonpoint sources or via a point source related to crop production.

## COUNSEL

Stephan C. Volker (argued), Stephanie L. Clarke, and Jamey M.B. Volker, Law Offices of Stephan C. Volker, Berkeley, California, for Plaintiffs-Appellants.

David S. Frankel (argued), Paul Cirino, Martha Mann, Brian C. Toth, Martin F. McDermott, and Michael T. Gray, Attorneys; Environment & Natural Resources Division; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; Amy L. Aufdemberge, Office of the Solicitor, United States Department of the Interior, Sacramento, California; for Defendants-Appellees.

Julie L. Fieber (argued), Joseph W. Cotchett, and Andrew Kirtley, Cotchett Pitre & McCarthy LLP, Burlingame, California; Diane V. Rathmann, Linneman Law LLP, Los Banos, California; Ellen L. Wehr, Grassland Water District, Los Banos, California; for Defendant-Appellee and Intervenor-Defendant-Appellee.

Theresa A. Dunham, Kahn Soares & Conway LLP, Sacramento, California, for Amici Curiae Association of California Water Agencies, California Cotton Ginners and Growers Association, California Farm Bureau Federation, California Fresh Fruit Association, California Rice Commission, East San Joaquin Water Quality Coalition, California Rice Commission, East San Joaquin Water Quality Coalition, Family Farms Alliance, Kern River Watershed Coalition Authority, Kings River Conservation District, Kings River Water Quality Coalition, Western

Agricultural Processers Association, Western Growers Association, and Westside Water Quality Coalition.

## OPINION

SANCHEZ, Circuit Judge:

The Clean Water Act ("CWA") generally prohibits the discharge of pollutants into navigable waters of the United States without a permit under the National Pollutant Discharge Elimination System ("NPDES") program. *See* 33 U.S.C. §§ 1311(a), 1342(a)(1). In 1977, Congress carved out an exemption to this permit requirement for "discharges composed entirely of return flows from irrigated agriculture" and entrusted the regulation of such discharges to the States. *Id.* § 1342(l)(1). Under this exemption, the Grassland Bypass Project ("Project") in California's Central Valley has operated without an NPDES permit since 1997. The Project comprises an expansive drainage system that takes in water used for irrigation from across 97,400 acres of land and transports that "return flow" over 28 miles through a canal before its ultimate discharge into the Mud Slough wetland.

At issue in this appeal is whether the statutory exemption for irrigation return flows has been wrongly applied to the Project because diffuse "nonpoint source" pollution—such as pollution from rainwater runoff or windblown dust and algae—commingles with the Project's return flows prior to discharge into waters of the United States. We agree with the district court that the Project's exempt status should be upheld and reject Plaintiffs' contention that the commingling of any amount of nonpoint source pollution from a non-agricultural source forecloses the exemption. To adopt

Plaintiffs' position would contravene the text, purpose, and structure of the Clean Water Act and render the exemption for irrigated agriculture a dead letter.   Accordingly, we affirm the district court's partial grant of summary judgment.

## I. BACKGROUND

### A. Clean Water Act

In 1972, Congress passed the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). One "central provision" of the Act is that "individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States." *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 602 (2013) (citing *id.* §§ 1311(a), 1362(12)).   While the CWA "banned . . . discharges from point sources" without NPDES permits, the "discharge of pollutants from nonpoint sources—for example, the runoff of pesticides from farmlands—was not directly prohibited." *Or. Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1096 (9th Cir. 1998) (quoting *Nat. Res. Def. Council v. EPA*, 915 F.2d 1314, 1316 (9th Cir. 1990)).   This differential treatment of "point sources and nonpoint sources is an organizational paradigm of the [CWA]." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 550 F.3d 778, 780 (9th Cir. 2008).

The CWA defines key terms such as "point source," "pollutant," "discharge of a pollutant," and "discharge" in service of that regulatory distinction.   A "point source" is defined in the statute as:

> [A]ny discernible, confined and discrete conveyance, including but not limited to any

pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14). The term "pollutant" is defined as:

[D]redged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

*Id.* § 1362(6). "[D]ischarge of a pollutant" and "discharge" are defined as:

(12) The term "discharge of a pollutant" [means] any addition of any pollutant to navigable waters from any point source . . . .

(16) The term "discharge" when used without qualification includes a discharge of a pollutant . . . .

*Id.* § 1362. Because "discharge of a pollutant" is necessarily "from any point source," *id.* § 1362(12), the term "discharge" refers specifically to a point source discharge of a pollutant. *See Dombeck*, 172 F.3d at 1096.

The CWA does not define "nonpoint source pollution," but "it is widely understood to be the type of pollution that arises from many dispersed activities over large areas, and is not traceable to any single discrete source." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1184 (9th Cir. 2002). "The most common example of nonpoint source pollution is the residue left on roadways by automobiles," such as "[s]mall amounts of rubber" that are "worn off of the tires of millions of cars" or the "minute particles of copper dust from brake linings" that eventually "wash off of the streets and are carried along by runoff in a polluted soup, winding up in creeks, rivers, bays, and the ocean." *Id.*; *see also Dombeck*, 172 F.3d at 1095 ("Other pollution sources, such as runoff from agriculture or in this case, animal grazing, are nonpoint sources."). Because nonpoint source pollution "arises in such a diffuse way, it is very difficult to regulate through individual permits." *Forsgren*, 309 F.3d at 1184.

Nonpoint source pollution lies outside the federal NPDES permit scheme and is "not regulated directly by the [CWA]." *Dombeck*, 172 F.3d at 1096. Rather, the CWA indirectly regulates nonpoint source pollution through "federal grants for state wastewater treatment plans" under Section 208, codified under 33 U.S.C. § 1288. *Id.* The CWA "envisions EPA's role in managing nonpoint source pollution . . . as limited to studying the issue, sharing information with and collecting information from the States, and issuing monetary grants." *Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 175 (2020). As the Supreme Court explained in *Maui*, "the structure of the [CWA] indicates that, as to groundwater pollution and nonpoint source pollution, Congress intended to leave substantial responsibility and autonomy to the States." *Id*. at 174.

Indeed, the regulation of nonpoint source pollution falls within States' "traditional regulatory authority." *Id.* at 175.

Although the CWA's direct regulation of pollution is limited to point source discharges, the Environmental Protection Agency ("EPA") nevertheless "found it difficult to process permit applications from countless owners and operators of point sources throughout the country." *Decker*, 568 U.S. at 602. One year after the passage of the CWA, the EPA promulgated regulations to exempt several kinds of point source discharges from the NPDES permit system, including discharges from irrigated agriculture. *Nw. Env't Def. Ctr. v. Brown*, 640 F.3d 1063, 1073 (9th Cir. 2011), *rev'd and remanded sub nom. Decker*, 586 U.S. 597. The EPA acknowledged "that the exempted categories of sources are ones which fall within the definition of point source," but concluded that these sources "[were] ill-suited for inclusion in a permit program." *Id.* at 1073-74 (citation omitted). The agency explained that "while some point sources within the excluded categories may be significant contributors of pollution . . . , it would be administratively difficult if not impossible, given Federal and State resource levels, to issue individual permits to all such point sources." *Id.* at 1074 (quoting 40 Fed. Reg. 56932 (Dec. 5, 1975)).

The EPA's attempt to exempt certain categories of point source discharges from NPDES permitting was rejected in *Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369 (D.C. Cir. 1977). The D.C. Circuit held that the EPA "does not have authority to exempt categories of point sources from the permit requirements" and that "[e]ven when infeasibility arguments were squarely raised, the legislature declined to abandon the permit requirement" because the CWA was designed to be a "tough law." *Id.* at 1375-77. What the EPA could not do by regulation,

Congress accomplished through legislation. In 1977, Congress amended the CWA to establish a statutory exemption for irrigated agriculture from NPDES permit requirements. *Brown*, 640 F.3d at 1073. The exemption provides:

> (l) Limitation on permit requirement
>> (1) Agricultural return flows
>> The Administrator shall not require a permit under this section for discharges composed entirely of return flows from irrigated agriculture, nor shall the Administrator directly or indirectly, require any State to require such a permit.

33 U.S.C. § 1342(l)(1). While "return flows from irrigated agriculture" was not defined by statute, Congress relied on the EPA's definition at the time of the amendment, which was "conveyances carrying surface irrigation return as a result of the controlled application of water by any person to land used primarily for crops." S. Rep. No. 95-370, 35 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 4326, 4360.

In establishing the irrigated agriculture exemption, Congress sought to accomplish three aims. First, Congress intended "to alleviate EPA's burden in having to issue permits for every agricultural point source." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Glaser*, 945 F.3d 1076, 1084 (9th Cir. 2019) (quoting *Brown*, 640 F.3d at 1073). As one member of Congress explained, "[t]he problems of permitting every discrete source or conduit returning water to the streams from irrigated lands is simply too burdensome to place on the resources of [the] EPA." 123 Cong. Rec. 38956 (Dec. 15, 1977) (statement of Rep. Roberts). Second,

the exemption "promote[d] equity of treatment among farmers who depend on rainfall to irrigate their crops and those who depend on surface irrigation which is returned to a stream in discreet [sic] conveyances." *Glaser*, 945 F.3d at 1084 (quoting 123 Cong. Rec. 26702 (Aug. 4, 1977) (statement of Sen. Stafford)); *see Forsgren*, 309 F.3d at 1189 (explaining that the "statutory exemption for agricultural return flows" reflected "the need for parity of regulation between irrigated and non-irrigated agriculture"). As one Congressman explained, the exemption "correct[ed] what has been a discrimination against irrigated agriculture . . . . Farmers in areas of the country which were blessed with adequate rainfall were not subject to permit requirements on their rainwater run-off, which in effect . . . contained the same pollutants." 123 Cong. Rec. 39210 (Dec. 15, 1977) (statement of Sen. Wallop).

Finally, the irrigated agriculture exemption was prompted because of the technological difficulties in determining whether pollutants commingled within an irrigation return flow could be traced to particular upstream sources. As the Senate Committee Report on the 1977 amendments to the CWA explained:

> Testimony in field hearings suggested that effluent limits based on technological methods may not be appropriate for control of return flow pollutants and the committee determined that these sources were practically indistinguishable from any other agricultural runoff, which may or may not involve a similar discrete point of entry into a watercourse. All such sources, regardless of the manner in which the flow was applied

> to the agricultural lands, and regardless of the
> discrete nature of the entry point, are more
> appropriately treated under the requirements
> of section 208(b)(2)(F).

S. Rep. No. 95-370, 35. In other words, Congress
determined that return flows from irrigated agriculture were
best managed under Section 208 as nonpoint source
pollution because it proved difficult, if not impossible, to
determine whether a given pollutant entered the waterway
through a point or nonpoint source. Pollutants from irrigated
agriculture "were practically indistinguishable" from
nonpoint sources such as agricultural runoff. *Id.* As one
Congressman described in a previously failed attempt to
adopt the exemption, it is "virtually impossible to trace
pollutants to specific irrigation lands, making these
pollutants a nonpoint source in most cases." 118 Cong. Rec.
10765 (Mar. 29, 1972) (statement of Rep. Roncalio); *see*
*Brown*, 640 F.3d at 1072.

Congress thus chose to regulate return flows from
irrigated agriculture under Section 208 as though they were
nonpoint sources of pollution. S. Rep. No. 95-370, 9. State-
managed treatment plans under Section 208 involve
procedures to "(i) identify, if appropriate, agriculturally and
silviculturally related nonpoint sources of pollution,
including return flows from irrigated agriculture, and their
cumulative effects . . . and (ii) set forth procedures and
methods . . . to control to the extent feasible such sources."
33 U.S.C. § 1288(b)(2)(F). Consistent with this
understanding, the definition of "point source" under the
CWA provides that "[t]his term does not include agricultural
stormwater discharges and return flows from irrigated

agriculture." *Id.* § 1362(14). With this background in mind, we turn to the facts of this case.

## B. Factual Background

The Grassland Bypass Project ("Project") in California's Central Valley is jointly administered by Defendants-Appellees Adam Nickels (Acting Regional Director of the U.S. Bureau of Reclamation), the U.S. Bureau of Reclamation, the San Luis & Delta-Mendota Water Authority ("SLDMWA"), and the Grassland Water District. Implemented in 1996, the Project comprises an extensive underground tile drainage system beneath the Grassland Drainage Area ("Drainage Area"), serving 97,400 acres of land within the Delta-Mendota sub-basin of the San Joaquin Valley.

Figure 1: Map of Grassland Drainage Area (comprising lands served by the Grassland Bypass Project) and Grassland Bypass Project monitoring locations



This Drainage Area is composed of active, fallow, and retired farmland as well as non-irrigable land used for public infrastructure, residences, and businesses. On part of the retired land is the Vega Solar Project, an array of solar panels that occupies 178.3 acres of formerly irrigated land. The Drainage Area is designed to remove the contaminated irrigation water delivered by the Central Valley Project and

used by farmers. *Glaser*, 945 F.3d at 1080. "Irrigation and drainage are inherently linked" because "[a]ny water project that brings fresh water to an agricultural area must take the salty water remaining after the crops have been irrigated away from the service area." *Firebaugh Canal Co. v. United States*, 203 F.3d 568, 571 (9th Cir. 2000).

After the water leaves the Drainage Area, it enters the Grassland Bypass Channel ("Bypass") that conveys it further into the San Luis Drain ("Drain"). The Drain is owned by the Bureau of Reclamation and operated by SLDMWA. The Drain spans approximately 28 miles and was built with expansion joints and weep valves to prevent damage to its concrete lining from the pressure of surrounding groundwater. Nonetheless, the Drain has accrued some damage over time. Due to its perforated design and accumulated damage, surrounding groundwater seeps into the Drain.

Sediments containing concentrations of pollutants like selenium have also accumulated in the Drain, requiring monitoring, occasional physical removal, and certain reductions in flow rates. At its terminus, the Drain discharges its contents into the Mud Slough wetland, a navigable water of the United States, which feeds into the San Joaquin River and lies adjacent to numerous national- and state-protected wildlife areas.

Since 1997, Defendants have operated the Project as a nonpoint source without an NPDES permit under the exemption for "discharges composed entirely of return flows from irrigated agriculture." 33 U.S.C. § 1342(l)(1). In place of NPDES permit requirements, the Project's discharges have been subject to state and local environmental regulations that set water quality standards for pollutants,

require certain monitoring practices, and establish best
practices requirements.

## C. Procedural History

Plaintiffs initiated this action in 2011 alleging that
Defendants' operation of the Project violated the CWA by
discharging pollutants unrelated to irrigated agriculture into
navigable waters without an NPDES permit.[1] After years of
litigation, the district court in 2016 granted in part
Defendants' motion for summary judgment. Plaintiffs then
brought their first appeal to this court. We resolved that
appeal in *Pacific Coast Federation of Fishermen's
Associations v. Glaser*, concluding that the district court
erred in three respects. 945 F.3d 1076 (9th Cir. 2019).

First, the district court erred by placing the burden on
Plaintiffs to demonstrate that the statutory exemption to
NPDES permitting for irrigated agriculture return flows did
not apply, rather than on Defendants to establish that it did
apply. *Id.* at 1083. Second, we concluded that the district
court erred in its interpretation of the exemption "for
discharges composed entirely of return flows from irrigated
agriculture" under 33 U.S.C. § 1342(l)(1), by construing
"entirely" to mean "majority." *Id.* at 1085. Third, we
disagreed with the district court's decision to strike certain
theories of liability on pleading grounds and remanded those
stricken claims to be reconsidered under the correct
interpretation of § 1342(l)(1). *Id.* at 1086-87. However, we
upheld the district court's broad interpretation of the term

---

[1] Plaintiffs are Pacific Coast Federation of Fishermen's Associations,
California Sportfishing Protection Alliance, Friends of the River, San
Francisco Crab Boat Owners Association, Inc., Institute for Fisheries
Resources, and Felix Smith.

"irrigated agriculture" to encompass "all activities related to crop production." *Id.* at 1083-85.

On remand, and following cross-motions for summary judgment, the district court reconsidered Plaintiffs' claims predicated on four alleged sources of pollutants: "(1) groundwater originating from beneath 'non-irrigated' land adjacent to the Drain which seeps into the Drain through cracks and weep holes; (2) sediment that has settled out over time in the Drain from the waters it carries and which is purportedly discharged into Mud Slough 'when it is scoured and reworked by flows in the Drain'; (3) water transported into tile drains underneath the retired agricultural land occupied by the Vega Solar Project; and (4) flows of polluted water in the Drainage Area that allegedly stem from 'highways, residences and other non-irrigated lands.'"

The district court began by reconsidering "the scope of the agricultural return flows exception provided by § 1342(l)(1)" following our decision in *Glaser*. The district court first concluded that the exemption covered "discharges that 'do not contain additional discharges from activities unrelated to crop production.'" The district court reasoned that "additional discharges" must mean discharges that are "[a]dded, extra, or supplementary to what is already present or available." Consequently, "to qualify for the exception[,] defendants must establish that plaintiffs' alleged four sources of pollutants are not added to the Project from an extra or supplementary *point source*." Next, the district court concluded that an activity is "related to crop production" so long as it "is related to the function and operation of the overall drainage plan."

Putting these pieces together, the district court concluded that, to qualify for the irrigated agriculture exemption,

"defendants must establish that plaintiffs' alleged sources of pollutants . . . are not added from an extra or supplementary point source that is unrelated to the Project's overall drainage function."    The district court concluded that Defendants carried their burden of establishing that the irrigated return flow exemption applied because each alleged pollutant was either added from a nonpoint source or was added from a point source that related to the Project's overall drainage function.    The district court granted in part Defendant's motion for summary judgment.[2]    This appeal followed.

## II. DISCUSSION

We review the district court's grant of summary judgment and its interpretations of the CWA de novo. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc) (summary judgment); *Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 905 (9th Cir. 2018) (CWA).    We agree with the district court that Plaintiffs failed to raise a genuine dispute of material fact as to whether the irrigated agriculture return flow exemption applies to the Project.    We conclude that the exemption applies because the alleged pollutants are either added to the Project via nonpoint sources or via a point source related to crop production.

### A.

Although Defendants have operated the Project without an NPDES permit since 1997, Plaintiffs seek to undo the

---

[2] The district court denied Defendants' motion for summary judgment challenging Plaintiffs' Article III standing and declined to reach Defendants' argument that the so-called water transfer rule (40 C.F.R. § 122.3(i)) exempted the Project from permitting requirements.

Project's exempted status on the ground that the Project's discharge into the Mud Slough contains pollutants that are not related to irrigated agriculture. To that end, Plaintiffs interpret the language of the exemption in 33 U.S.C. § 1342(l)(1) to require that the exemption "appl[ies] only to *pollutants* that originated 'entirely' from irrigated agriculture." In Plaintiffs' reading, if an irrigation return flow commingles to any degree with pollutants unrelated to irrigated agriculture, then an NPDES permit is required for its discharge. To hold otherwise, according to Plaintiffs, would "effectively repeal[] the term 'entirely,' and preclude[] permit regulation of commingled discharges." We disagree.

Plaintiffs' theory does not follow from the text and is inconsistent with the purpose and structure of the CWA, and as a practical matter would render the irrigated agriculture exemption a dead letter. One of "our longstanding canons of statutory construction" is that "we must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Ysleta del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

We begin with the text of the statute. The irrigation return flow exemption applies to "discharges composed entirely of return flows from irrigated agriculture." 33 U.S.C. § 1342(l)(1). This is not the first time we address the meaning of this provision. In *Glaser*, we approached the text in two pieces. We began by noting that the "plain meaning of the statutory text" did not resolve "whether the discharges at issue [were] exempt from the CWA's permitting requirement." *Glaser*, 945 F.3d at 1084. Accordingly, we relied on the legislative history of

§ 1342(l)(1) to broadly interpret the term "irrigated agriculture" as encompassing "all activities related to crop production." *Id.* at 1084-85. Turning next to the word "entirely," we observed that it was not defined by the statute and considered its ordinary meaning to conclude that "'[e]ntirely' is defined as 'wholly, completely, fully.'" *Id.* at 1085 (quoting *Webster's Third New International Dictionary* 758 (2002)).

The text does not dictate, however—and we did not decide in *Glaser*—whether "entirely" requires every pollutant within a return flow to be from irrigated agriculture or every discharge within a return flow to be from irrigated agriculture. In other words, the statute's use of the word "entirely" is ambiguous because the statute does not clarify the category of objects that "entirely" is meant to exclude. Consider the following analogy illustrating this ambiguity: If someone were to say, "My wallet is filled entirely with twenties," we might accept that statement as true even if the wallet also contained, say, a family photo, because the person presumably meant only that the wallet does not contain other denominations of money. Similarly, the text of § 1342(l)(1) can be read as applying to discharges composed entirely of return flows *as opposed to non-agricultural discharges*.

Given the ambiguity in the text, we turn to a highly probative piece of legislative history for guidance, as we did in *Glaser*. *See In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1180-81 (9th Cir. 2013) ("Where the statutory text is ambiguous . . . we may 'look to other interpretive tools, including the legislative history' in order to determine the statute's best meaning." (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 567 (2005))). Specifically, we quoted the Senate Committee Report's

explanation that "[t]he word 'entirely' was intended to limit the exception to only those flows which do not contain additional discharges from activities unrelated to crop production."**[3]** S. Rep. No. 95-370, 35; *see Glaser*, 945 F.3d at 1084 (quoting this language). It is fair to presume that the Report, which was "written by the same legislators that authored the exemption and which accompanied the proposed language in an effort to explain the language's meaning to the other members of the Senate and House," *Pac. Coast Fed'n of Fishermen's Assn's v. Glaser*, No. CIV S-2:11-2980-KJM, 2013 WL 5230266, at *11 (E.D. Cal. Sept. 16, 2013), *rev'd and remanded on other grounds*, 945 F.3d 1076 (9th Cir. 2019), used key statutory terms as they were defined by the statute. *Cf. Garcia v. United States*, 469 U.S. 70, 76 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill . . . ."). Under the CWA, the term "discharge" necessarily presumes a point source. *See* 33 U.S.C. § 1362(12), (16); *see also Dombeck*, 172 F.3d at 1097 (holding that "[t]he term 'discharge' in § 1341 is limited to discharges from point sources"). Applying the statutory definitions in the context of the exemption's legislative history, we agree with the district court in concluding that the exemption applies to irrigation return flows that do not contain additional point source discharges from activities unrelated to crop production.

Such a reading is consistent with the purpose and structure of the CWA and Congress's enactment of the

---

[3] Plaintiffs concede that *Glaser* stated that the text of § 1342(l)(1) "meant discharges that 'do not contain additional discharges from activities unrelated to crop production.'"

irrigated agriculture exemption.  As discussed above, "[n]onpoint source pollution is not regulated directly by the [CWA]." *Dombeck*, 172 F.3d at 1096.  Indeed, the CWA "uses the 'threat and promise' of federal grants to the states to accomplish this task." *Id.* at 1097 (quoting *Shanty Town Assocs. Ltd. P'ship v. EPA*, 843 F.2d 782, 791 (4th Cir. 1988)).  Leaving nonpoint source pollution to the States, the CWA's NPDES permitting scheme focuses on pollution from point sources, "presumably because they could be identified and regulated more easily tha[n] nonpoint source polluters." *Id.* at 1096 (quoting *Nat. Res. Def. Council v. EPA*, 915 F.2d at 1316 ); *see also U.S. Forest Serv.*, 550 F.3d at 780 ("Congress primarily focused its regulation under the [CWA] on point sources, which tended to be more notorious and more easily targeted . . . .").

As we explained above, Congress established the irrigated agriculture exemption to address three primary concerns.  Congress sought to lessen the EPA's burden in having to issue permits to an excessive number of point source discharges related to irrigated agriculture. *See* 123 Cong. Rec. 38956 (Dec. 15, 1977) (statement of Rep. Roberts).  The exemption was also designed to address the unequal treatment between farmers who depend upon rainfall to irrigate their crops and were not subject to federal permitting requirements, and other farmers who relied on surface irrigation and were subject to NPDES permitting. *See* 123 Cong. Rec. 39210 (Dec. 15, 1977) (statement of Sen. Wallop); *see also Glaser*, 945 F.3d at 1084.  Finally, the irrigated agriculture exemption reflected the technical difficulties of regulating return flow pollutants through the permitting scheme because it was practically impossible to determine whether agricultural pollutants were originally from point or nonpoint sources. *See* S. Rep. No. 95-370, 35.

In enacting the exemption, Congress determined that return flows from irrigated agriculture were best managed under Section 208 as nonpoint sources of pollution, through direct regulation by the States. *Id.*

If Plaintiffs' theory were correct that for the exemption to apply, irrigation return flows cannot contain *any* amount of nonpoint source pollution unrelated to irrigated agriculture, then all three of Congress's aims would be thwarted. The EPA would again face the heavy burden of issuing permits for an inordinate amount of irrigation return flows. *See Glaser*, 945 F.3d at 1084. Farmers reliant on surface irrigation for their crops would be disproportionately burdened with NPDES permit requirements relative to farmers blessed with abundant rainfall for their crops. *Id.* And the EPA would be saddled with the "virtually impossible" task of disentangling commingled pollutants, tracing them back to specific irrigated lands, and imposing permit requirements for point source discharges on those farms. 118 Cong. Rec. 10765 (Mar. 29, 1972) (statement of Rep. Roncalio).

Plaintiffs' interpretation of the CWA would also render the irrigation return flow exemption a dead letter. As Plaintiffs' counsel conceded at oral argument, some amount of nonpoint source pollution unrelated to irrigated agriculture will inevitably commingle with irrigation return flows. For example, one nonpoint source pollutant Plaintiffs seek to regulate through the NPDES permit is "windblown dust." Under Plaintiffs' reading of the statute, an irrigation system would have to ensure that *no* windblown dust ever enters the return flow conveyance for the return flow to qualify under the statutory exemption—a scientific impossibility. We cannot adopt a statutory reading which

we know will sap the interpreted provision of all practical significance.

The same would apply for other nonpoint sources of pollution within an agricultural district such as runoff from highways and roads, groundwater seepage containing pollutants, or sediment that encroaches upon return flow conveyances. *See Forsgren*, 309 F.3d at 1184. Setting aside the difficult question of determining when a nonpoint source pollutant is "related to crop production," Plaintiffs have not been able to explain how any irrigated agriculture system would ever qualify for the exemption under their interpretation of § 1342(l)(1).

## B.

Plaintiffs contend that their reading of the CWA is mandated by Supreme Court and Ninth Circuit precedents, which hold that an NPDES permit is required whenever nonpoint source pollutants are "ultimately discharged through a point source." Because the record here establishes a point source discharge of pollutants into navigable waters—effluent flows from the Drain into the Mud Slough—that is sufficient to require a permit under the CWA and to foreclose the irrigated agriculture exemption. Plaintiffs primarily rely on two cases, *South Florida Water Management District v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004) and *Committee to Save Mokelumne River v. East Bay Municipal Utility District*, 13 F.3d 305 (9th Cir. 1993).

In *Miccosukee*, the defendants operated a water pump— a point source—that pumped polluted water from a canal into a navigable water. 541 U.S. at 100-01. The defendants argued that the pump's operation did not require an NPDES permit because the pollutants it discharged did not originate

from the pump itself. *Id.* at 104. The Supreme Court rejected this argument and explained that "a point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'" *Id.* at 105. Put differently, "a point source is not exempt from the [NPDES] permit requirement merely because it does not itself add pollutants to the water it pumps." *Id.* at 112 (Scalia, J., concurring in part and dissenting in part).

In *Mokelumne*, the defendants operated a dam that discharged water into the Mokelumne River, a navigable water. 13 F.3d at 306-07. Commingled within this discharged water was surface runoff from an abandoned mining site that was channeled and then collected in the dam reservoir prior to discharge. *Id.* at 307. Similar to the defendants in *Miccosukee*, the defendants argued that the dam's discharges were not subject to NPDES permit requirements because the dam did not itself "add" any pollutants to a navigable water. *Id.* at 308. We disagreed and found the dam's discharge to be a point source discharge of pollutants because "the source of pollution added to the Mokelumne River is 'surface runoff that is collected or channelled by' defendants from the abandoned mine site." *Id. Mokelumne* thus held that a point source that channels "surface runoff" is subject to the permit requirement because the CWA "categorically prohibits any discharge of a pollutant from a point source without a permit." *Id.* at 309.

*Miccosukee* and *Mokelumne* are inapposite because neither case involved the statutory exemption for irrigated agriculture under 33 U.S.C. § 1342(l)(1). In the absence of the exemption, Plaintiffs are correct that a point source that conveys a pollutant—even if it does not generate that pollutant—is subject to the NPDES permitting scheme. *Miccosukee*, 541 U.S. at 105. But Congress carved out an

exemption to the NPDES permit requirement for certain discrete conveyances, including "discharges composed entirely of return flows from irrigated agriculture." 33 U.S.C. § 1342(l)(1). The fact that irrigation return flows are ordinarily point source discharges is precisely why Congress carved out the exemption in the first place. *See Brown*, 640 F.3d at 1073-74. Therefore, the analysis in *Miccosukee* and *Mokelumne* about the kinds of discharges that are subject to NPDES permitting provides no answer to the distinct question here—how we should interpret and apply the statutory exemption for return flows from irrigated agriculture.[4]

In conclusion, we hold that the exemption for "discharges composed entirely of return flows from irrigated agriculture" under 33 U.S.C. § 1342(l)(1) applies so long as the return flow does not contain additional point source discharges from activities unrelated to crop production.

## C.

Having established the scope of the irrigation return flow exemption, we now turn to Plaintiffs' four alleged sources of pollution commingled in the Project's return flow:

---

[4] We reject Plaintiffs' contention that "it is impossible to have two separate point sources in sequence, because by definition, a 'point source' discharges to a water of the United States." In *Maui*, the Supreme Court rejected the view that a point source must be the "immediate" source of a pollutant's addition into navigable waters. 590 U.S. at 172, 181 (holding that "pollution that reaches navigable waters only through groundwater" may still constitute "pollution that is 'from' a point source"). The Court reasoned that "[t]here is nothing unnatural about such a construction" of the CWA, as it "does not say 'directly' from or 'immediately' from." *Id.* at 182. "Indeed, the expansive language of the provision—*any* addition from *any* point source—strongly suggests its scope is not so limited." *Id.*

(1) seepage into the Drain from groundwater beneath non-irrigated land adjacent to the Drain; (2) groundwater seepage and runoff from "highways, residences and other non-irrigated lands" in the Drainage Area; (3) sediment that the Drain carries and discharges into the Mud Slough; and (4) runoff and groundwater from retired agricultural land occupied by the Vega Solar Project in the Drainage Area.

Plaintiffs contend that each of these sources of pollutants invalidates the Project's exempt status. We disagree. To reiterate, the irrigated agriculture exemption applies to discharges that do not contain additional point source discharges from activities unrelated to crop production. This means that for the exemption to apply here, Defendants bear the burden of demonstrating that the Project's discharged pollutants are either from a nonpoint source or from an additional point source that is related to crop production. *See Glaser*, 945 F.3d at 1083-85. Here, the district court correctly concluded that no genuine dispute of material fact exists as to whether any of these alleged pollutants originated from an additional point source that was unrelated to crop production.[5]

First, groundwater seepage into the Drain from adjacent non-irrigated and unfarmed lands is not a point source discharge. It is well-established that groundwater seepage is a type of nonpoint source pollution. Unlike a point source that is a "confined and discrete conveyance" like a "pipe, ditch, [or] channel," 33 U.S.C. § 1362(14), groundwater seepage is diffuse. *See also Maui*, 590 U.S. at 169

---

[5] Plaintiffs' counsel conceded at oral argument: "In this case, we identified four categories of pollutants that were *nonpoint source in nature* but were contributing to the pollutants in the waste stream discharged by the Drain."

(indicating without explanation that groundwater is a nonpoint source). Because groundwater seepage is not a point source discharge, Plaintiffs' evidence that "contaminated groundwater . . . seeps into the Drain" fails to create a genuine dispute of material fact.

Second, groundwater seepage and runoff from "highways, residences, and other non-irrigated lands" in the Drainage Area do not constitute point source discharges. Runoff is another quintessential example of nonpoint source pollution. We have explained that "the term 'runoff' describes pollution flowing from nonpoint sources." *Dombeck*, 172 F.3d at 1098 ("'Congress had classified nonpoint source pollution as runoff caused primarily by rainfall around activities that employ or create pollutants.'" (citation omitted)). Accordingly, the runoff and seepage here do not constitute additional point source discharges that would potentially foreclose application of the statutory exemption.

Third, accumulated and remobilized sediment in the Drain is not an additional point source discharge from activities unrelated to crop production. According to Plaintiffs, sediment in the Drain comes from either "dust, wind-blown plant debris, algae, and cattails" or from the return flow from the Bypass discharged into the Drain. Dust and other wind-blown particles do not originate from a discrete conveyance and thus do not constitute point source discharges. The discharge from the Bypass into the Drain *is* a discrete point source discharge, but the Bypass's conveyance of the Project's irrigation return flow to the Drain is clearly part of the Project's overall function and operation and is related to crop production. Therefore, pollution from sediment accumulated and remobilized in the Drain does not raise a genuine dispute of material fact

because it originates from nonpoint sources or from a point source related to crop production.

Lastly, runoff and groundwater from the land occupied by the Vega Solar Project do not constitute point source discharges. The alleged runoff is based on rainwater falling onto the site and water from solar panel washing. The alleged groundwater seepage involves natural upwelling of "older and deeper groundwater" into the tile drain system underneath the Vega site.[6] As discussed, both runoff and groundwater seepage are nonpoint sources of pollution. In addition, runoff from the Vega site does not create a genuine dispute of material fact because Defendants' uncontroverted evidence establishes that the runoff could not have penetrated eight feet into the ground to reach the Project's subsurface tile drains. Defendants' expert testified that between the Vega solar panel washings and rainfall, runoff flows penetrated less than an inch into the soil. Defendants also presented evidence of model simulations demonstrating that during the relevant period—that is, after the Vega site was converted from its previous agricultural use to its solar use—rainwater and surface runoff would not have percolated deep enough. Plaintiffs' expert failed to rebut this evidence. In short, Plaintiffs failed to dispute Defendants' evidence that there was no point source discharge of a pollutant from the Vega Solar Project.

We agree with the district court that no genuine dispute of material fact exists as to whether the four sources of pollutants "constitute nonpoint sources or whether they stem from 'activities related to crop production.'"

---

[6] The tile drain system underneath the Vega site long predates the Vega Solar Project and continues to serve adjacent farmland.

### III. CONCLUSION

The CWA exempts "discharges composed entirely of return flows from irrigated agriculture" from the NPDES permitting scheme. 33 U.S.C. § 1342(l)(1). We hold that the irrigated agriculture exemption applies when return flows do not contain additional point source discharges from activities unrelated to crop production. In the absence of a genuine dispute of material fact, we affirm the district court's conclusion that Defendants have met their burden of establishing that the irrigation return flow exemption under 33 U.S.C. § 1342(l)(1) of the CWA applies to the Project.

**AFFIRMED.**

## CERTIFICATE OF SERVICE

I, Stephanie L. Clarke, declare:

My business address is the Law Offices of Stephan C. Volker, 1633 University Avenue, Berkeley, California 94703.

On October 20, 2025 I served the following document described as

### APPELLANTS' PETITION FOR REHEARING EN BANC

by electronic filing with the Clerk of the Court using the CM/ECF system for the United States Court of Appeals for the Ninth Circuit, which sends notification of such filing to the email addresses registered in the above entitled action.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct.


s/  *Stephanie L. Clarke*
STEPHANIE L. CLARKE